Filed 10/2/14  Renfro v. Cal. Dept. of Corrections etc. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TERRALYN N. RENFRO, | C070371 |
| Plaintiff and Respondent, | (Super. Ct. No. 34200800002606CUOEGDS) |
| v. | |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, | |
| Defendant and Appellant. | |

By special verdict a jury found that race was a motivating factor in firing plaintiff Dr. Terralyn N. Renfro, an African American contract psychologist for the Department of Corrections and Rehabilitation (department), and the department did not have a legitimate nondiscriminatory reason to discharge her that, standing alone, would have induced the department to make the same decision.  The department appeals, insisting the jury should have been required to find that her race was a "substantial" motivating reason, not simply a motivating reason, and there is not substantial evidence to support the jury's finding of

1

racial discrimination.  With due deference to the jury's key findings and the inferences it drew from the totality of the evidence, we affirm.

**FACTS**

Because the evidence is so surprisingly murky, we begin with this question:  who fired Terralyn Renfro?  The two men at the top of the hierarchy at Mule Creek State Prison (Mule Creek) were Brett Williams, M.D., the chief medical officer and hiring authority of all of the health care departments, and W. J. "Jeff" White, Ph.D., the chief psychologist.  Williams, who is also African American, was not in the office on July 19, 2007, the day plaintiff was fired.  He testified he did not know plaintiff had been fired until after it was done, and he was uncomfortable with the way it was done.  His assistant, Terri Weinholdt, testified, however, that she consulted with Williams throughout the day and obtained his approval.  She then authorized White to fire plaintiff.  White did not testify.

Katherine Powell, Ph.D., was plaintiff's supervisor.  According to Powell, White did not have independent authority to terminate anyone; Williams alone had final authority on who was hired and fired.  Powell hired plaintiff after a telephone interview and did not know she is African American until she arrived.  Powell was on medical leave the day plaintiff was fired and denied making the decision to fire her.  Williams asked Powell to provide him a written statement of the reasons plaintiff was fired, but she never did.  Powell testified that White did not tell her he was going to fire plaintiff.

Psychologist Kathleen Keller, who became plaintiff's supervisor in Powell's absence, testified that she spoke to Powell throughout the day plaintiff was fired about discharging plaintiff.  Neither Powell nor Keller had the authority to fire a contract psychologist, and neither claimed they did so.

Nevertheless, there is no dispute that plaintiff was fired on July 19, 2007.  Williams, who was the hiring authority, did not notify her.  Nor did White, who was authorized to terminate contract personnel.  Nor did any of plaintiff's supervisors.  That

2

was left to the registry contracts analyst, who did not know plaintiff but delivered a notice of discharge, told her to pack up and leave the facility within an hour and 15 minutes or she would be walked off the premises with custody, and escorted her off the grounds.

Of course, the dispositive question is not who fired plaintiff, because someone at the department clearly did, but why?  As in any case of alleged discrimination, there is the totality of the circumstantial evidence from which the trier of fact can infer a racial animus, and there are the reasons the employer proffers to justify the termination.  We examine both.

*The Overview*

Even to her detractors, plaintiff was a dedicated clinician.  Until her termination, she was committed to providing mental health services to the inmates of California, and she worked in several institutions as a contract psychologist to achieve her dream.  She attempted to provide services beyond her job description and took the initiative to create new opportunities for inmates.  While her coworkers described her as well-respected, polite, easy to get along with, professional, and extremely dedicated to her job as a prison psychologist, the jury could have inferred that two or three women did not share that view and ultimately engineered the termination of the only African American psychologist at the time.

Plaintiff's immediate supervisor, Dr. Powell, is at the center of the controversy, and the evidence is conflicting about how she viewed and treated plaintiff.  On the one hand, she encouraged plaintiff to become a civil servant and volunteered to write her a letter of recommendation.  On the other hand, however, she reported plaintiff's alleged transgressions repeatedly to White.  Plaintiff argues that over a period of six months, Powell attempted to have plaintiff terminated based on events and accusations that were entirely untrue.

Plaintiff served on an interdisciplinary team with Powell; Marilyn Immoos, another psychologist; George Esposito, a social worker; and Gia-Evita Lonzano, a

psychiatrist. Lonzano praised plaintiff's work. But Immoos was less admiring. Apparently, she was offended when plaintiff, over dinner, had asked if Immoos would rent a room in her house to substantially shorten plaintiff's commute. She complained to Powell, who testified in her deposition that she reported to White that plaintiff had forced her way into Immoos's home and Immoos had felt physically threatened. No one reported the incident to employee relations, and no one asked plaintiff about it or conducted any kind of an investigation. Both Immoos and plaintiff denied this had occurred. Although they differed as to when the meal took place, both testified they had enjoyed a pleasant dinner together.

But Immoos voiced other issues she had with plaintiff. She complained to Powell that plaintiff's caseload was too low relative to hers. When given the opportunity to discuss the workload imbalance in a face-to-face meeting with plaintiff, Immoos was unable or unwilling to have a frank conversation with plaintiff. She testified, however, that plaintiff came to her later. She did not appear happy and raised her voice, but Immoos cannot recall a single thing plaintiff actually said. She conceded that plaintiff had no control over the number of inmates on her caseload. And much later she complained that plaintiff left inmates unattended. Their relationship continued to deteriorate over time, and the hostility had consequences for the effectiveness of the entire team. Indeed, even after plaintiff was fired, the residual tension between Immoos and other team members "made working together very difficult," and Immoos transferred to another yard and a different program.

On one occasion Powell asked plaintiff to lead a substance abuse group. Plaintiff expressed her desire not to lead such a group because she was struggling with substance abuse within her family and did not think she would be effective. Powell reported to White that plaintiff was being insubordinate. Plaintiff testified she did not refuse to lead the group but suggested that another psychologist might do so. Powell never mentioned it again and did not document anything about it.

4

Lonzano testified that Powell did not treat plaintiff with the same level of respect she showed other health professionals at the prison. Powell repeatedly dismissed plaintiff's ideas and cut her off during team meetings. Powell testified that one reason she did not approve a library group that plaintiff wanted to start was because it was a noncore group. She did, however, allow Immoos and Esposito, two other members of plaintiff's team, to conduct noncore groups.

Two of plaintiff's attempts to go above and beyond the requirements of her job backfired. She was asked to speak to Criminals and Gangsters Anonymous, a self-help group on the yard, and to assist in providing resources. It was not affiliated with the mental health program at the prison. She did so on her own time in an attempt to provide additional resources to the inmates. Later she heard rumors that she had become too familiar with one of the inmates in attendance. She notified Powell immediately, although nothing inappropriate had happened. She was instructed not to participate in the self-help groups, even after hours. She complied.

The most contentious issue at trial involved plaintiff's efforts to offer a self-help library for the inmates. She proposed the idea to Powell in about January or February of 2007. She had support from professionals throughout the prison. She testified that Powell, too, was supportive and gave her verbal approval. Lonzano testified that the library was openly discussed in team meetings, that everyone applauded the idea, that Powell specifically expressed that it was a good idea, and that the entire team was contributing to and taking credit for it. George Esposito also testified that the library was a regular topic of conversation.

The opening of the library, however, was delayed while plaintiff's team moved to "B annex"–a facility to house group meetings and other services for the mental health patients. B annex presented a number of security and confidentiality challenges when it opened because it was a large warehouse, the size of a high school gymnasium, filled with cubicles. Initially, mirrors were not installed that would have enabled guards to see

5

all the inmates at all times. Nevertheless, there was a guard posted at the door checking each inmate to assure that he was allowed into the room. The guards, not the psychologists, were charged with securing the premises. Plaintiff talked with Captain Arnold, the facility captain for B yard, about security for the library and received support from staff sponsors for the inmate-run organizations, chaplains, and recreational therapists. Captain Arnold checked out the safety and security of the library and did not raise any issues or concerns. Even Powell conceded that general population inmates were not kept completely separate from the mental health care inmates.

According to plaintiff, Powell authorized her to put together a list of books she wanted for the library. She prepared what she thought of as a wish list, knowing that she would not get all the books she asked for. Powell balked at the cost but did not voice objection to the library. Plaintiff prepared and distributed a flier announcing the opening of the library. Dana Blanchard, the team's office technician, saw Powell reading the flier. She also received written approval from Powell to place the library on the schedule. Powell stopped by the library shortly after it opened and expressed no dissatisfaction or disapproval. Yet she insisted she did not approve the library, never talked to Blanchard about it, Blanchard never gave her a schedule with the library on it, and she never had been in the library. Williams was shown documents indicating plaintiff had written approval to start a library, which contradicted what others had told him.

The jury certainly could infer that the library was popular with the inmates as both mental health and general population inmates began using it. Plaintiff testified the library was approved separately from treatment group programs and the library service would be available to everyone. But while Powell was on medical leave, Immoos complained to the acting supervisor, Kathleen Keller, that general population inmates had infiltrated the library and that plaintiff left the inmates unsupervised. Plaintiff explained that on two occasions she had taken a few steps outside the library when summoned by another

6

health care professional and the facility captain, and on one occasion she had walked outside of the library area to get a resource and then returned.

Plaintiff testified that Keller told her Powell wanted to shut down the library. Keller expressed her concern about safety and security to plaintiff the day before she was fired. At trial, the two described plaintiff's reaction to the concerns differently. Keller testified that plaintiff "said that she thought the way that it was going was fine and she wasn't intending to change anything" and that when plaintiff was specifically told to stop the library group, she responded that "[s]he was not going to stop doing her group." Keller further testified that she asked plaintiff a second time to stop the library group and she refused again. Although Keller talked to Captain Arnold about safety, she did not mention a concern about the general population inmates being present in the library.

Plaintiff testified that when Keller told her to close the library, she did. She admitted that she told an inmate who had heard the library was closing to show up the next day. The next day would be her last. Inmates lining up to use the library helped her pack her materials.

Keller further testified that she consulted with Powell about plaintiff despite the fact Powell was on medical leave. Ashley Altschuler, the registry contracts analyst, typed up a letter of discharge and delivered it to plaintiff. Altschuler stayed with her until she was packed and left the prison.

As it turned out, plaintiff lost more than a job: she lost her career with the department. Shortly after her discharge, she applied for a variety of jobs within the prison system. She was rejected time and time again. Several months after her discharge she was informed that there was a " '[d]o not hire' " notation on her file, thus precluding her from working at any prison within the state. No one has ever explained to her why the " '[d]o not hire' " notation appears on her file, and she does not know why it is there.

## *The Department's Reasons for Firing Plaintiff*

Shocked and distressed, plaintiff asked White to explain why she had been fired. Until the day she was fired, she testified, no one had ever told her that her demeanor was hostile or threatening, or that she had offended Immoos by asking her to rent a room or that she had offended Immoos during dinner. White gave her the following reasons: (1) she started a library that management had not approved; (2) Dr. Keller spoke with her about it and she responded negatively; (3) she had several contentious interactions with Powell, and operating the inmate library was the latest in a series of incidents; and (4) concern that she might be the type of person who shared information with general population inmates.

Plaintiff attempted to get more clarification, but Weinholdt, who was also in the room, invoked " 'The Ten Minute Rule,' " which meant that the conversation needed to terminate in ten minutes because "we were not getting anywhere." Plaintiff remembered White invoked a five, rather than a ten, minute rule. Plaintiff further recalled, "And then Terri Weinholdt told me that I couldn't tell anybody at all why I was being fired, but if I wanted to keep talking, I could continue talking by myself in the parking lot. And if this was going to be a problem, that she could call security to escort me out."

Unbeknownst to plaintiff, Powell had a written proposal process, and typically when her clinicians proposed starting or restarting a group, they completed a form describing the program. Plaintiff did not prepare a written proposal. She was aware of other clinicians' concerns, but she did not consider the self-help library a treatment group and knew that the general population and mental health inmates commingled in other parts of the prison.

Plaintiff testified that no one at Mule Creek ever made any racially derogatory comments to or about her. Although she was the only African American psychologist at the prison at the time she was hired and fired, another African American had been hired

during her tenure but left before plaintiff was fired.  A Caucasian was hired to replace plaintiff.

***Jury Verdict***

The jurors accepted the court's invitation to ask questions of each witness after the lawyers had completed their examinations.  By a nine-to-three vote, they found that race was a motivating factor in firing plaintiff, and by a ten-to-two vote, the department did not have any legitimate nondiscriminatory reason that, standing alone, would have justified her termination.  The jury awarded plaintiff $945,480 in damages.  The department appeals.

## DISCUSSION

## I

### Instructional Error

In *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*), the California Supreme Court held that a plaintiff must produce evidence to show that discrimination was a *substantial* motivating reason in the termination, not merely a motivating reason. (*Id*. at p. 232.)  The department urges us to reverse the judgment because the jury was erroneously instructed in the language of the standardized jury instruction crafted pre-*Harris* that the discrimination was a "motivating reason" and not, as *Harris* compels and the post-*Harris* revised jury instruction provides, a "substantial motivating reason."  (See pre- and post-*Harris* CACI Nos. 2500, 2507.)

In the aftermath of *Harris*, at least two courts have reversed judgments for the employee and remanded the cases for a new trial with instructions to properly instruct the jury that discrimination must be a substantial motivating reason.  (*Mendoza v. Western Medical Center Santa Ana* (2014) 222 Cal.App.4th 1334, 1341-1342 (*Mendoza*); *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 478-479, 483.)  In both cases, however, the instructional error was prejudicial.

9

The failure to properly instruct the jury in a civil case is not necessarily prejudicial. (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 655.) "When deciding whether an instructional error was prejudicial, 'we must examine the evidence, the arguments, and other factors to determine whether it is *reasonably probable* that instructions allowing application of an erroneous theory *actually* misled the jury.' [Citation.] A 'reasonable probability' in this context 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' [Citation.]" (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682.) "Reversal for instructional error is warranted only where the reviewing court concludes ' "the error complained of has resulted in a miscarriage of justice." [Citation.]' [Citations.]" (*Whiteley*, at p. 656.)

The department, over the vehement objection of plaintiff, requested the special verdict inquiry that, on appeal, takes all the guesswork out of what the jury reasonably might have decided had it been properly instructed. The special verdict form specifically asked the jury the following question: "At the time of the discharge, did [the department] have a legitimate and sufficient non-discriminatory reason to discharge Dr. Renfro that, standing alone, would have induced [the department] to make the same decision?" And the jury responded, "No." Thus, we need not speculate whether the jurors would have found for the department had they been properly instructed that discriminatory animus must have been a "substantial motivating reason" because they have already told us that it was the *only* reason. According to the jury, there was no other legitimate nondiscriminatory reason that, standing alone, would have induced the department to fire plaintiff.

So called "mixed-motive" cases, where an employer entertains both discriminatory and nondiscriminatory reasons for a discharge, raise slippery and difficult issues of causation. (*Mendoza*, *supra*, 222 Cal.App.4th at p. 1339.) As Justice Liu ponders in *Harris*, "What is the trier of fact to do when it finds that a mix of discriminatory and legitimate reasons motivated the employer's decision?" (*Harris*, *supra*, 56 Cal.4th at

10

p. 215.)  But here the jury expressly found there were no legitimate reasons and, by doing so, solved the prejudice puzzle for us.

We accept the admonition that in assessing the prejudicial impact of the instructional error we must view the evidence in the light most favorable to the department.  (*Mendoza*, *supra*, 222 Cal.App.4th at p. 1342.)  We also acknowledge that the question whether the discharge was race based was a close one, as evidenced not only by a thorough review of the entire record, but also by the trial court's ruminations and the nine-to-three and ten-to-two verdicts.  But despite how close we may believe the evidence of a discriminatory motivation might have been, the fact remains that the jury concluded there were no legitimate nondiscriminatory reasons for plaintiff's discharge. The question as to whether or not the discriminatory motivation was substantial would have arisen only if the jurors had believed there were other legitimate nondiscriminatory reasons for the discharge.  Since they found there were none, the instructional error was not prejudicial; that is, there is no reasonable chance that a properly instructed jury would have decided the issue differently.

The department tries to skirt the problem of prejudice.  It argues that the jury must first find that discrimination was a substantial motivating reason before it reaches the affirmative defense that plaintiff would have been fired anyway, for legitimate nondiscriminatory reasons.  But a prejudice analysis is always retrospective.  On appeal, we are not constrained by the order in which a jury decides the factual issues before it. Rather, in our quest to ascertain whether there has been a miscarriage of justice, we review what the jury actually found, and if those findings assure us that any error was harmless, we must affirm the judgment.

## II

## Sufficiency of the Evidence

We agree with the trial court and the department that the evidence of racial bias in this case is thin.  There is no direct evidence of racial slurs, jokes, slights, or remarks.

11

Plaintiff has never suggested that there was. And the trial court aptly summed up what the jury might have found: "[T]his was a case where the jury could have said there were issues of maybe interpersonal communication, or style, or inability to follow standard operating procedures within the [department], which is more like a paramilitary organization, and Dr. Renfro just didn't fit in. And it had absolutely nothing to do with the fact that she was African-American. It had more to do with an imperfect fit between her personality and the job that she needed to do. Black, white, orange, yellow, no matter what. Clearly, the jury could have decided to go in that direction." Without question, there was ample evidence to support a defense verdict.

Yet the jury rejected those inferences from the abundance of circumstantial evidence it considered. And our job as a reviewing court is a familiar one. We must draw all reasonable inferences from the evidence to support the judgment, whether or not we would have drawn the same inferences. (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 420.) We must scrutinize the entire record to determine whether the evidence is reasonable in nature, credible, and of solid value to satisfy us that the evidence marshaled is of ponderable legal significance. (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1218-1219.) Seldom is there direct evidence of a discriminatory motive in employment discrimination cases, and therefore circumstantial evidence is as persuasive as direct evidence. (*Harris*, *supra*, 56 Cal.4th at pp. 231-232.) Nevertheless, the inferences drawn from circumstantial evidence must be reasonable and cannot be based on suspicion, imagination, speculation, surmise, conjecture, or guesswork. (*Joaquin*, at p. 1219.)

Plaintiff readily admits that as a contract employee she could be fired for no good reason at all. As a result, she had the burden to prove that the department's motivation was discriminatory; that is, it was race based. She introduced evidence of the rudimentary facts necessary to support her claim: that she is African American and there were no other African American psychologists working at the prison when she was hired

12

and when she was fired; that Powell hired her following a telephone conversation and was unaware that she is African American; that on the day she was fired, Williams, who is also African American and was the designated hiring/firing authority for the prison, was not on the premises; and that she was replaced with a Caucasian.

Those raw facts set the context for her discrimination claim. But there is a pernicious pattern the jury may have inferred from the totality of the evidence giving far greater weight to plaintiff's allegations. The pattern involves department personnel lying. There is no question that some of the department's witnesses lied at trial by contradicting each other on key facts. For example, Williams testified that he did not know plaintiff was fired until after the decision had been made and executed. Yet his key assistant, Terri Weinholdt, testified she consulted with him throughout the day and he approved the discharge. Similarly, Powell insisted that she did not approve plaintiff's proposal to start a library, and she certainly never approved the participation of general population inmates. Lonzano, Blanchard, and Esposito testified Powell did approve the library. There was written documentation to support their testimony. Powell also testified she was never in the library; plaintiff testified she dropped in soon after it opened. If those who were, or should have been, most intimately involved in the decision to fire plaintiff obfuscated their roles and told inconsistent stories, the jury could reasonably infer that their motives were not what they claimed and the testimony they provided was incredible.

It was particularly troubling that no one would take responsibility for having made the decision to fire plaintiff. Williams denied it. Powell denied it. Keller denied it. Weinholdt denied it. And White did not testify. Indeed, White was a rather mysterious, if absent, figure at trial. By all accounts, he was the one who explained the department's reasons for the discharge when plaintiff, shocked and distraught, demanded an explanation. But unlike Powell and the members of plaintiff's interdisciplinary team, there was no evidence about White's relationship with plaintiff, if he knew her, worked with her, observed her running groups or counseling inmates, or had any interactions with

13

her at all. In the absence of evidence as to who actually made the decision to fire her, the jury was free to draw the inference that there was an insidious conspiracy of discrimination.

What is clear is the central role of plaintiff's supervisor, Powell. Plaintiff argues that Powell was on a six-month vendetta to fire her. While it is true Powell was on a medical leave at the time plaintiff was fired, it is not true she was divorced from the process. She admitted that White contacted her about plaintiff while she was on leave. Keller testified that she spoke to Powell twice about the unfolding drama regarding the library. But from plaintiff's point of view, the discharge was the mere culmination of a concerted effort to fire her that had been mounting over time.

The jury heard evidence that Immoos was offended by plaintiff, felt threatened by her, and complained about the size of her caseload, her lackadaisical approach to supervision, and of her commingling general population inmates with mental health patients. The jurors may have inferred that Powell and Immoos were in cahoots or that the information Immoos provided was the ammunition Powell needed to justify her desire to discharge plaintiff. But even Immoos did not support Powell's account that plaintiff had forced her way into Immoos's house and threatened her. Lonzano's testimony that Powell treated plaintiff differently, that she discounted what she said, and that there was an obvious chill in the way she reacted to her could have cemented an inference that Powell entertained a racial animus toward plaintiff.

The coup de grace was the humiliation the department inflicted upon her. The jury reasonably could have inferred a discriminatory motive from the timing and manner of the discharge, not to mention the fact the department flagged her file with a " '[d]o not hire' " warning without notifying her or explaining the reason she was permanently banned from working at any prison in the state of California. After all, plaintiff was fired when the African American hiring authority was off site; it was a contract analyst rather than any of the supervisors in her line of command who told her she was fired; there was

14

evidence she was told she needed to be off the premises in an hour and 15 minutes; and then she was closely monitored and ultimately escorted to her car.  The jury reasonably could have rejected the notion that this was the customary manner in which the department treated all contractors and could have concluded instead that this particular brand of humiliation was racially motivated.

That is not to say a discriminatory motive was the only reasonable inference the jurors might have drawn from the evidence.  As the trial court pointed out, Powell, Immoos, and the others may have been offended by plaintiff's personality, not her race, or any other number of nondiscriminatory factors.  The department argues forcefully on appeal, as it did at trial, that plaintiff was fired because she was insubordinate and violated prison protocol, not because she is African American.  The department insists that other contractors were fired without cause and were similarly escorted off the prison premises.

It goes without saying that it is not our job to draw the inferences of motive from all the circumstantial evidence presented.  Rather, it is the jury's prerogative, based on the totality of the evidence, to draw the same reasonable inference plaintiff drew–that she was singled out, marginalized, and ultimately fired because she is African American.  While the evidence was not overwhelming, we simply cannot say it was based on mere speculation or guesswork.  Discrimination does not always present as in a scene from To Kill a Mockingbird or The Birth of a Nation.[1]  Even the most racially intolerant manager will often appreciate the need for circumspection, so smoking guns are rarely found, no matter how thorough the investigation for bias.  A compelling inference of discrimination may be drawn from the accumulation of circumstances surrounding the hiring, treatment,

---

[1]  To Kill a Mockingbird (Universal Pictures 1962); The Birth of a Nation (D. W. Griffith Productions 1915).

and dismissal of an employee, a pattern of dissemblance in explaining negative attitudes toward the employee, and the absence of legitimate reasons for discharge.

In our view, the jury drew a reasonable inference of discrimination from a pattern of deception, obfuscation, and mistreatment. It is certainly true that the department could have fired plaintiff without justification or good cause; it simply could not fire her because of her race. Here, however, the jury expressly found the department had *no* legitimate, nondiscriminatory reason that, standing alone, would have induced it to discharge plaintiff and, in so doing, forcefully rejected the department's entire defense. Because there is substantial evidence to support the jury's findings, we must affirm the judgment.

**DISPOSITION**

The judgment is affirmed.

                                                    RAYE          , P. J.

We concur:

        ROBIE         , J.

        MAURO         , J.

16